Evans V. Brewster, S.
Petitioner seeks a construction of article Fourth of decedent’s will and a determination by the court that the trust therein has lapsed resulting in a merger of the trust remainder with the estate of the life income beneficiary.
Under article Fourth, decedent placed his residuary estate in trust, giving the entire net income first to his wife, who has since died, and then to his daughter, the petitioner herein. Upon the death of the daughter, the remainder is given to her issue and then provides: "in case, however, my said daughter shall die without issue her surviving, I give, devise and bequeath such residuary estate and all accrued income thereon, absolutely to the Chancellor of the Exchequer of the Kingdom of Great Britain to use and apply the same on account of the payment of the National Debt of Great Britain to the United States of America.”
While ordinarily an application for a construction of a will will be denied as premature if sought before the death of a life tenant or before the occurrence of any contingencies (Matter of Mount, 185 NY 162; Matter of Stout, 1 AD2d 901; Matter of Suydam, 139 Misc 845), a present construction may be had if adequate reasons are given (Matter of Lederer, 4 AD2d 623; Matter of McLaughlin, 62 Misc 2d 124, mod 36 AD2d 614, mod on Surrogate’s opn by reinstating decree of that court 30 NY2d 781).
*57 Petitioner states that she has no issue and that by reason of her advanced years, she is incapable of having children; that the debt of Great Britain to the United States was intended by testator to be the debt arising out of World War I; that the gift over to the Chancellor of the Exchequer has now lapsed since Great Britain regards the debt as canceled and does not recognize any debt as due and owing; that the trust remainder is now a lapsed residuary legacy and becomes intestate property; and that petitioner is the sole person entitled to decedent’s intestate property. Petitioner contends that there is a merger of her life estate with her "intestate remainder” so as to extinguish the trust. In addition, petitioner seeks a determination as to the validity or invalidity of the trust remainder at this time in order to assist her with the planning and disposition of her own estate.
Decedent was a native citizen of Scotland and resident alien of the United States from 1913 until his death on October 23, 1934. The will, in his own handwriting, is dated May 10, 1927 and was admitted to probate on November 5, 1934. In clear language, testator indicated a primary concern for his family by providing a trust to benefit his wife, then his only child, his daughter, and finally disposed of the remainder. Having discharged his obligation to his family, testator then provided for the contingency of his daughter dying without issue by a disposition for the benefit of both his native country and country of his residence. A brief recital of historical facts will help understand what may have motivated testator’s alternate bequest.
Pursuant to the Liberty Bond Acts of 1917, advances were made to governments allied with the United States. In accordance therewith the total amount of money advanced to Great Britain exceeded $4.2 billion dollars. While interest was paid to the United States on the amounts advanced, it became apparent as early as 1922 that none of the debtor nations was financially able to discharge its obligations on the terms specified, and Congress created the World War Foreign Debt Commission to negotiate funding arrangements under which debtor governments could pay their debts. Great Britain submitted a proposal for annual installments of principal to be paid from 1923 to 1984, which also permitted postponement of principal payments for no more than two years and allowed postponement of half the interest during the first five years. This proposal was accepted by the World War Foreign Debt *58 Commission on June 19, 1923. Payments were made under this agreement until 1930. When it became apparent that Germany was unable to make its reparation payments to European nations, the United States proposed that if Germany were permitted to withhold the payment of reparations in 1932, the United States would suspend payments from the European countries to it. By a joint resolution of Congress on December 23, 1931, the moratorium proposal was authorized. After the moratorium expired, Great Britain under great strain made the payment due December 15, 1932, paid only a small part of the interest due on the next payment on June 15, 1933, paid no principal and a token payment of interest on the next installment date of December 15, 1933 and finally defaulted in making any payment on June 15, 1934 and thereafter.
That the decedent was well conversant with the financial plight of Great Britain and of world conditions in general cannot be denied. He was an employee of the Carnegie Corporation from the time he came to the United States and was fatally stricken in his office on October 23, 1934. The will he wrote in 1927 reveals a concern for Great Britain and while he was capable, he made no changes in the will. His reference to the national debt of Great Britain to the United States could only refer to the only debt extant at that time and is conceded by the parties to be the World War I debt due from Great Britain to the United States.
Petitioner, while conceding that the moneys advanced to Great Britain have not been repaid, takes the position that there is in fact no debt due. No determination of a debt is requested since obviously it is beyond the jurisdiction of the court. Petitioner, however, claims that the events of the past lead to but one conclusion — namely, that there is no debt, that Great Britain does not recognize any debt and that the Chancellor of the Exchequer of the Kingdom of Great Britain would not accept any legacy paid on condition that it be applied to a nonexisting and unacknowledged debt of Great Britain arising out of World War I. Petitioner argues that the fact that there has been no payment on this debt for over 40 years is clear indication that Great Britain has no intention to pay. Moreover, while cited in this proceeding, Great Britain has chosen to ignore all process thus indicating a lack of interest in the World War I debt and by implication agreement with petitioner’s position. Finally, petitioner asserts that *59 it is the declared position of Great Britain that the moneys advanced by the United States to all allied countries in World War I were part of a system of interallied co-operation in aid of the struggle against a common enemy, and because the enormous sums involved in these intergovernmental debts presented such a serious problem to the recuperation of the world, the course to be followed should be the policy pursued by Great Britain after the Napoleonic Wars, to wit, to treat the moneys advanced as subsidies rather than loans, with no expectation of repayment. However, no evidence was introduced to support the conclusion that Great Britain would not honor the express terms of the will of this decedent.
The contention of petitioner has no doubt been given sympathetic consideration by many individuals. The facts, however, do not lend themselves to the conclusions reached by petitioner. Before adequately recovering from the strains of the worldwide economic depression of the 1930’s, Great Britain was once again plunged into a World War which drained her resources, precluded payment on old debts and once again compelled large-scale borrowing from the United States. Thus, while it is true that no payment has been made by Great Britain on the World War I debt for over 40 years, it is equally true that there has been no official repudiation of the debt or negotiation for ultimate settlement thereof. The proof submitted herein indicates that as of the present date the Treasury Department of the United States carries the obligation of Great Britain for World War I as an open loan with a maturity date of 1984 which is now in excess of $9.4 billion.
Petitioner’s theory on renunciation of the legacy is that Great Britain has acted inconsistent with any acceptance; that is, by nonpayment of any part of the debt after having defaulted in 1934 and also by failing to appear formally in this proceeding to assert its interest in the legacy. However, nonpayment of the debt must still be viewed in the light of official communications between the governments involved. Although Great Britain defaulted in 1934, there has never been any official repudiation or question as to the validity of the World War I debt. In fact, in the last communication on this subject in December, 1940, the British Ambassador stated that Great Britain was willing to reopen discussions on the subject whenever circumstances warranted the hope that a satisfactory result might be reached. In order to repudiate or renounce a legacy, an affirmative act is required (Matter of *60 Wilson, 298 NY 398) and it must be "clear and unequivocal”. (Matter of Carpenter, 36 Misc 2d 346, 348.) The facts do not demonstrate any repudiation or renunciation of the legacy.
Furthermore, the fact that Great Britain has not appeared in this proceeding is not indicative of any position taken with respect to the debt. Refusal to appear may be because the amount of the legacy, while substantial for an individual, makes so little impact in reduction of the World War I debt as to be almost insignificant, generating little or no interest in the outcome of the litigation. Whether or not Great Britain would transmit a payment from the estate of this decedent to the United States in accordance with the terms of the will need not be determined at this time. There is no proof that it would not honor the wishes of decedent. It is significant that a transmittal of funds in accordance with a legacy from the estate of Mary Mundy, a native of Great Britain, was forwarded to the Treasury Department from the United Kingdom Treasury on March 24, 1949 to be applied to the interest on the World War I debt as stated in her will. There is nothing to indicate that a similar transmittal would not be made in this estate.
Finally, with respect to the argument that the money advanced was in the nature of a subsidy and not a debt, the proof submitted was contained in a document entitled "Britain’s World War I Debt to the United States” filed by the British Information Services with the United States Department of Justice. The British Information Services is an agent of the British Government registered with the Foreign Agents Section of the Department of Justice. Papers issued by the British Information Services are not official pronouncements of the government but rather offer a favorable British viewpoint of the matters discussed therein. British Information Services proposed in one of its documents that World War I debt be considered a subsidy — a proposition in the nature of a trial balloon sent aloft to test the reaction generated therefrom. Repetition of the proposal by them is mere propaganda. The documents offered in evidence by the petitioner to rebut the factum of the debt indicate mere wishful thinking on the part of British Information Services and are without probative value.
The proof is insufficient to show that the trust created by testator has lapsed, is illegal or cannot be performed. The essential elements of a valid trust exist, namely, petitioner as *61 a designated beneficiary, a designated trustee who is not the beneficiary, an identifiable fund, and actual delivery of the fund to the trustee (Brown v Spohr, 180 NY 201; Matter of Fontanella, 33 AD2d 29).
Accordingly, the court determines that the trust created under article Fourth of the will is in full force and effect and has not lapsed or become invalid; has not merged with petitioner’s life estate and is not vested in her.